UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MAUREEN DOWNS,<br><br>    Plaintiff,<br><br>    v.<br><br>UNUM LIFE INSURANCE COMPANY OF AMERICA,<br><br>    Defendant. | Case No. 23-cv-01643-RS<br><br>**ORDER ON MOTIONS FOR JUDGMENT** |

## I. INTRODUCTION

Plaintiff Maureen Downes (erroneously spelled "Maureen Downs" in the caption of this matter) has brought this action against defendant Unum Life Insurance Company of America ("Unum") pursuant to Section 502(a)(1)(B) of the Employee Retirement Income Security Act ("E.R.I.S.A."), 29 U.S.C. § 1132(a)(1)(B). Plaintiff seeks benefits under the Hoag Medical Group Long Term Disability Plan ("the Plan") which is insured and administered by Unum pursuant to a group long-term disability policy ("the Policy").

A record-review proceeding took place pursuant to Federal Rule of Civil Procedure 52 in August of 2024, during which the parties' cross-motions for judgment based on the Administrative Record (AR) were heard. Pursuant to the facts adduced at that hearing, the parties' briefing, and in the AR, judgment is entered for the Plaintiff. This Opinion and Order comprises the findings of fact and conclusions of law required by Federal Rule of Civil Procedure 52(a).[1]

---

[1] To the extent any conclusions of law are inadvertently labeled as findings of fact (or vice versa), the findings and conclusions shall be considered "in [their] true light, regardless of the label that

## II. BACKGROUND

A. Plaintiff's medical history

In 2020, Plaintiff was a 69-year-old pediatric physician in practice for over forty years. Her last day worked was February 27, 2020. On March 3, 2020, Plaintiff underwent surgery for uterovaginal prolapse and a hysterectomy. Her doctor, Dr. Matthew Clark, advised that Plaintiff would be disabled following her surgery until at least May 21, 2020 to recover from the procedure.

Plaintiff suffered several multiple medical issues leading up to and resulting in her surgery. In December of 2019, Plaintiff presented to her OBGYN, Dr. Clark, several symptoms she was experiencing, including a vaginal prolapse, complaints of urinary incontinence, fatigue, night sweats, headaches, asthma, gastritis, as well as a history of cancer. AR 184. She requested a hysterectomy based on an abnormal endometrial biopsy that showed precancerous changes in her uterus. Following some further testing by Dr. Clark, Plaintiff's surgery was scheduled for March of 2020.

Shortly after Plaintiff's surgery, the COVID-19 pandemic surged. On March 4, 2020, Governor Newsom declared a state of emergency in California due to the rising number of positive COVID-19 cases. On March 13, 2020, President Trump issued a proclamation declaring the outbreak of COVID-19 a national emergency. Governor Newsom issued the statewide "Stay at Home Order," on March 19, 2020, ordering "all individuals living in the State of California to stay home or at their place of residence except as needed to maintain continuity of operations of the federal critical infrastructure sectors."

The rapidly evolving health landscape had serious repercussions for Plaintiff's wellbeing. AR 228. In addition to the risks of COVID-19 posed by her vocation, Plaintiff suffered multiple medical issues placing her at heightened risk of a severe COVID-19 infection including diabetes,

---

the . . . court may have placed on [them]." *Tri–Tron Int'l v. Velto*, 525 F.2d 432, 435–36 (9th Cir. 1975).

hypertension, asthma, obstructive sleep apnea, as well as her history of heart attack, cancer, and fatty liver disease. The Center for Disease Control (CDC) issued guidance in 2020 listing several of these conditions as COVID-19 risk factors that had the potential to lead to severe infection. Plaintiff's advanced age at the onset of her disability also put her at increased risk of COVID-19 infection, as 81% of COVID-19 deaths in 2020 occurred among those aged 65 and over. Betzaida Tejada-Vera and Ellen A. Kramarow, *COVID-19 Mortality in Adults Aged 65 and Over: United States, 2020*, Center for Disease Control, NCHS Data Brief No. 446 (October 2022). Given these risk factors and Plaintiff's potential exposure, she sought coverage under the Plan's long-term disability insurance policy.

B. The Policy's terms

Per the terms of the Policy, Plaintiff was insured for long-term disability. The Policy included a 90-day elimination period, which required the insured be disabled continuously for 90 days in order to be eligible for benefits. Due to Plaintiff's age at the onset of her disability, she could be eligible for a maximum of 12 months of benefits payments at 60% of her monthly pre-disability earnings, totaling approximately $88,000 (60% of her pre-disability salary for 12 months). The Policy also defined a "total disability" as one resulting from sickness or illness and premised on the insured being "unable to perform with reasonable continuity the substantial and material acts" necessary for the insured to perform his or her occupation as usual.

C. Claim history

On May 22, 2020, Plaintiff submitted to Unum her claim for disability benefits. She claimed her disability onset date as March 3, 2020, or the date of her surgery. On July 21, 2020, she submitted her claim, along with an Attending Physician Statement (APS) from her urogynecological surgeon, Dr. Clark, which explained that Plaintiff had undergone surgery on March 3, 2020 and was restricted from heavy lifting or pushing, repetitive kneeling or squatting, or extended sitting or standing during her recovery until May 21, 2020. Plaintiff also submitted an APS from Dr. Nancy Cauncelbaum, her primary care physician, highlighting Plaintiff's heightened COVID-19 risks and complications as well as her depression as the basis for her

disability. Dr. Cauncelbaum opined that Plaintiff should be restricted from working from May 20, 2020 to January 1, 2021, at which point her condition be reassessed.

On August 24, 2020, Plaintiff submitted a Long-Term Disability Claim Form identifying as the basis of her disability her high risk of exposure to COVID-19, metabolic syndrome, Tamoxifen (a medication taken to protect Plaintiff from a recurrence of breast cancer), depression, back pain, asthma, and heart attack. In September 2020, Dr. Cauncelbaum submitted to Unum yet another form concluding that due to Plaintiff's "chronic medical conditions, her age, and her work as a pediatrician she is at high risk for COVID-19 complication" and that Plaintiff was accordingly advised to "limit her patient exposure until the pandemic situation is improved." Dr. Cauncelbaum suggested that these conditions be reassessed in January of 2021.

Unum denied Plaintiff's claim for benefits on November 10, 2020, stating in relevant part that:

> There is high risk of infection with COVID-19 with the insured's occupation. There is also risk of severe illness with COVID-19 due to her medical conditions. However, the risks can be reduced with [personal protective equipment ("PPE")] and preventative measures as outlined by [the Occupational Safety and Health Administration ("OSHA")]. Thus, given the ability to reduce the risks, our physician reviewer opines that you are not precluded from performing the full-time duties of the occupation.

AR 347-49. Plaintiff provided Unum with further information in January of 2021, largely regarding medical concerns other than those that would put her at risk for COVID-19, and filed a formal appeal in March of 2021 to no avail.

D.  Unum's review of Plaintiff's claim

On May 22, 2020, Plaintiff notified Unum of her claim. Based on the Plan's terms, she had to show disability to at least June 1, 2020 to be eligible for benefits. Unum was informed by Plaintiff's employer, Hoag Medical Group, that Plaintiff worked 24 hours a week prior to the onset of her disability, and her last worked day was February 27, 2020.

Following Plaintiff's submission of the Long-Term Disability Claim Form in August 2020, Unum spoke with Plaintiff's husband, Gregory Kirkorowicz, on August 31, 2020 based on

ORDER ON MOTIONS FOR JUDGMENT
CASE NO. 23-cv-01643-RS

4

authorization from Plaintiff. He explained that a pre-cancerous tumor had been removed from Plaintiff during her March 2020 surgery and that she had minimal issues as a result.

Unum informed Plaintiff it would be seeking further information from her employer and physicians. It obtained Dr. Cauncelbaum's records and reviewed Plaintiff's claim for depression. Dr. Robert Nosaka, Unum's on-site physician, reviewed Plaintiff's claim and opined that Plaintiff would not be restricted from working as a physician. Dr. Nosaka further suggested that Plaintiff's issues were controllable by medications and Plaintiff's risk of COVID-19 exposure could be minimized by "preventative measures and [protective personal equipment] as outlined by OSHA." Several weeks later, after a more thorough analysis, Dr. Nosaka stated that "the medical evidence does not support that the insured was/is precluded [from working] from 5/22/2020 forward," or the date Dr. Clark initially suggested she could return to work. Dr. Nosaka also suggested that an independent Designated Medical Officer interpret the data for Plaintiff's functional capacity.

Unum consequently sought review in November of 2020 of Plaintiff's records by Dr. Jamie Lewis, a physical medicine and rehabilitation physician. He determined Dr. Cauncelbaum's conclusion that Plaintiff would be unable to work until January of 2021 was unsupported by the medical records and reiterated the possibility of preventative and protective measures to diminish the risk of COVID exposure. Accordingly, Disability Benefit Specialist Jonathan Abhay wrote to Plaintiff on November 10, 2020, denying her claim in the letter described above. On July 19, 2021, Plaintiff was informed that her appeal was denied.

### III. LEGAL STANDARD

E.R.I.S.A permits a beneficiary to sue "to recover benefits due to [her] under the terms of [her] plan…" 29 U.S.C. § 1132(a)(1)(B). Federal Rule of Civil Procedure 52(a)(1) provides that "[i]n an action tried on the facts without a jury ... the court must find the facts specially and state its conclusions of law separately." In a Rule 52 motion, the relevant inquiry is whether the plaintiff is disabled under the policy. *Oster v. Standard Ins. Co.*, 759 F. Supp. 2d 1172, 1185 (N.D. Cal. 2011) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1095 (9th Cir. 1999)). Thus, the Court must conduct "a bench trial on the record" through which it evaluates the persuasiveness of

conflicting testimony and makes findings of fact based on a rereading of the material in the administrative record. *Kearney*, 175 F.3d at 1095.

A denial of benefits challenged under E.R.I.S.A "is to be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Under this standard of review, "the court does not give deference to the claim administrator's decision, but rather determines in the first instance if the claimant has adequately established that he or she is disabled under the terms of the plan." *Muniz v. Amec Constr. Mgmt., Inc.*, 623 F.3d 1290 (9th Cir. 2010). Here, the parties agree that a de novo standard of review applies. The plaintiff has the burden of showing, by a preponderance of the evidence, that she was disabled under the terms of the Plan during the claim period. *Oster*, 759 F. Supp. 2d at 1185. Generally, review is limited to the evidence contained in the administrative record, but the Court may consider extrinsic evidence "*only* when circumstances *clearly establish* that additional evidence is *necessary* to conduct an adequate de novo review of the benefit decision." *Opeta v. Nw. Airlines Pension Plan for Contract Emps*., 484 F.3d 1211, 1217 (9th Cir. 2007) (emphasis in original).

## IV.  DISCUSSION

In her initial claim for benefits, Plaintiff asserted that her medical issues[2] resulted in a long-term disability such that she was unable to return to work in May as previously proscribed by Dr. Clark following her surgery. She provided her disability onset date as March 3, 2020. Although she now contests that date, arguing it should be earlier, for the purposes of reviewing the record, a hypothetical earlier date is irrelevant.

In support of her claim, Plaintiff submitted an APS by her primary care physician, Dr. Cauncelbaum, who stated that Plaintiff had both "high risk for COVID-19 complications due to

---

[2] The medical issues identified in Plaintiff's claim include high risk of COVID-19 exposure, metabolic syndrome, Tamoxifen, depression, chronic back pain, asthma, and a history of heart attack in 2014.

underlying health issues" and "depression" as the bases for her disability. Dr. Cauncelbaum explained that Plaintiff's treatment required "continu[ing] medical management for health problems." Plaintiff insisted that a host of medical issues she experienced, which preceded the COVID-19 surge, caused her disability. Importantly, the medical issues identified by Dr. Cauncelbaum and Plaintiff were untethered to Plaintiff's March 3, 2020 surgery, so the surgery was not part of her disability claim. Rather, she contends that the various other medical issues she suffered were the basis for her claim. The March 3, 2020 date claimed by Plaintiff as the disability onset date thus more accurately reflects the date she was first out of work as a result of a medical issue. Subsequently, during her post-surgery recovery, when COVID-19 surged, Plaintiff became disabled due to her underlying medical issues and would remain so until at least January 2021, as advised by her physician.

No controlling authority has explicitly decided whether a present condition that puts a beneficiary at high risk of COVID-19 but would not otherwise prevent them from completing their usual occupational responsibilities constitutes a disability. Consequently, whether Plaintiff's risk of COVID-19 constitutes a disability requires inquiry of the facts at hand and the terms of the Policy.

A. Plaintiff's risk of COVID-19

Several of Plaintiff's medical conditions and comorbidities, including her history of cancer, asthma, diabetes, coronary artery disease with a history of heart attack, and fatty liver disease, were known and remain COVID-19 risk factors as outlined by the CDC.[3] Plaintiff was also 70 years old when she filed her claim, which placed her at even greater risk of COVID-19 infection. Unum does not contest that Plaintiff suffered these medical conditions or that she was at great risk of COVID-19 due to her age, but nonetheless characterizes her well-founded concerns

---

[3] The Court takes judicial notice, pursuant to Federal Rules of Evidence 201, of the CDC webpage titled "People with certain Medical Conditions and COVID-19 Risk Factors." Available at: https://www.cdc.gov/covid/risk-factors/index.html (last visited on August 19, 2024). Similarly, judicial notice is taken of other publications referenced herein.

about returning to work as a simple "decision" she undertook due to her "fear of COVID-19," rather than a prophylactic measure taken to protect herself.

Plaintiff's concerns were not so trivial. In March of 2020, the state of COVID-19 was not what it is today. Following a rapid spread of severe illness and death globally, governments imposed stay-at-home orders to protect individuals from infection. While most were able to shift their employment from the workplace to home, many were unable to make this transition. In the pre-vaccine era, the risk of COVID-19 to those individuals loomed large. During this time, Plaintiff was a healthcare worker. As part of her occupation, she regularly saw patients who might be infected with COVID-19. Her vocation as a pediatric physician exposed her to "known or suspected COVID-19 patients," putting her "high exposure risk" for the virus according to Dr. Nosaka, Unum's physician, and classified her job at "very high exposure risk" by OSHA.

Unum insists Plaintiff's fear of COVID-19 cannot constitute a disability because, under her theory, "every healthcare worker aged 65 and up would have been deemed disabled had they made a claim for disability benefits during the pandemic." Notwithstanding that this statement ignores the plethora of medical issues Plaintiff experienced, Unum's floodgates scenario is unrealistic. Plaintiff's concerns were limited to a particular time period – the immediate advent of COVID-19, which was so serious that it caused a global shutdown. Moreover, Plaintiff's age and underlying medical impediments placed her at severe risk of infection and, not trivially, death.

In support of the argument that a risk of harm or death from returning to work can indicate a disability, Plaintiff relies on *Evans v. UnumProvident Corp.*, 434 F.3d 866 (6th Cir. 2006). There, the Sixth Circuit held that a nursing home administrator who suffered from a seizure disorder was disabled within the meaning of her long-term disability policy because her ordinary work was high stress and likely to trigger seizures. *Id.* at 879. The Court held that an existing illness that was likely to manifest into a future injury if the plaintiff returned to work constituted a disability. *Id.* ("The district court, in its well-reasoned opinion, accurately noted that so-called "prophylactic" restrictions are not precluded from consideration in disability determinations under the terms of the LTD policy."); s*ee also Saliamonas v. CAN, Inc.*, 127 F. Supp. 2d 997, 1001

1   (N.D. Ill. 1991) ("To suggest, as CNA does, that a permanent heart condition that may be

2   aggravated by stress can only rise to the level of a disability when and if the insured suffers a heart

3   attack is unreasonable").

4         Plaintiff also points to several cases which concluded that a claimant's "risk of relapse"

5   can constitute a present disability. In *Colby v. Union Security Insurance Company*, the First

6   Circuit held that an anesthesiologist who suffered from a substance abuse disorder was disabled

7   within the meaning of her long-term disability policy, rejecting the idea that risk of relapse cannot

8   constitute a present disability. 705 F.3d 58, 66 (1st Cir. 2013) ("In our view, a risk of relapse into

9   substance dependence—like a risk of relapse into cardiac distress or a risk of relapse into

10  orthopedic complications—can swell to so significant a level as to constitute a current

11  disability."). The court also noted that a present illness that is likely to become disabling, even if

12  the plaintiff is physically able to return to work, could constitute a disability. *Id.; see also Kuffner*

13  *v. Jefferson Pilot Fin. Ins. Co.,* 595 F. Supp. 2d 785, 796 (W.D. Mich., 2009) (holding that the

14  claimant need not wait until he experienced an actual relapse because that would be "untenable

15  given the serious risk this poses to public health and safety . . . Defendant essentially engaged in a

16  form of 'benefits Russian roulette' with plaintiff's career and his patients' lives at risk.").

17        Unum correctly points out that the risk-of-relapse theory advanced by Plaintiff has often

18  failed, citing to *Stanford v. Continental Casualty Company*, 514 F.3d 354, 360 (4th Cir. 2008).

19  There, the Fourth Circuit rejected the risk-of-relapse theory and held that a nurse anesthetist living

20  with substance abuse disorder was not disabled within the meaning of her long-term disability

21  policy. Like in *Colby*, the plaintiff in *Stanford* worked in anesthesiology and could not return to

22  her previous occupation because her present substance abuse disorder placed her at heightened

23  risk of relapse were she to work administering opioids. *Id.* However, unlike in *Colby* the court in

24  *Stanford* did not accept the risk-of-relapse theory, finding that the insurance company did not

25  abuse its discretion in denying long-term disability benefits. *Id.*

26        *Stanford* is distinguishable. There, the Fourth Circuit grappled with the claimant's agency

27  that would prevent him from relapsing to his substance abuse disorder. The court reasoned that:

28

> A doctor with a heart condition who enters a high-stress environment like an operating room "risks relapse" in the sense that the performance of his job duties may cause a heart attack. But an anesthetist with a drug addiction who enters an environment where drugs are readily available "risks relapse" only in the sense that the ready availability of drugs increases his temptation to resume his drug use. Whether he succumbs to that temptation remains his choice; the heart-attack prone doctor has no such choice.

514 F.3d at 358. Plaintiff's risk of COVID-19 is similarly out of her control and requiring her to continue working in a high-risk environment is likely to cause her serious injury or death. Further, the court in *Colby* rejected the notion that the risk-of-relapse theory concerns a "speculative future possibility." 705 F.3d at 65. Here, too, Plaintiff's medical issues in 2020 were based on her existing medical impediments.

   B.   Nature of Plaintiff's work

In addition to Plaintiff's underlying medical impediments, her particular work responsibilities and the nature of her employment rendered her disabled. *Giberson v. Unum Life Insurance Company of America* is instructive. There, a district court held that a security officer's disability benefits were appropriately terminated despite his heightened risk for serious COVID-19 complications. No. CV 1:21-00305, 2022 WL 7139763, at *10, *19 (S.D.W. Va. Oct. 12, 2022). The court reasoned the insurance company's determination that the plaintiff could return to work despite his COVID-19 risk factors was reasonable because his "occupation[] would present low risk of coronavirus exposure with the use of personal protective equipment . . . . The Occupations identified are performed in an office environment and would be considered low risk for exposure." *Id.* at *7 (quoting the insurance company's response to Giberson's appeal). In 2020, Plaintiff's occupation, by contrast, exposed her to COVID-19 on a regular basis as even Unum's own internal papers and guidelines by OSHA conceded.

Unum also relies on *Osborn v. Paul Revere*, where another district court held that the insured plaintiff, an oral surgeon, was not prevented from working under threat of COVID-19 and due to his inability to obtain PPE. No. 1:21-cv-00842-CDB, 2024 WL 1020486 (E.D. Cal. Mar. 8, 2024). In that case, unlike here, no doctor had recommended the plaintiff stop working. *Id.* at *9. The court also noted that the temporary lack of PPE was not a basis for Plaintiff to be unable to

return to work as "there were mitigating steps [the plaintiff] could have taken to be proactive about working with comorbidities in the presence of COVID-19." *Id*. He could, the court reasoned, take the temperature of his patients or require negative COVID-19 tests before seeing them. *Id*. Plaintiff's work responsibilities, by contrast, required her to see patients precisely to determine whether they were infected with COVID-19. Unlike the plaintiff in *Osborn*, it would be "impossible" for Plaintiff to fulfil the obligations of her occupation if she were to avoid seeing COVID-19 positive patients. *Id*.

*Lasser v. Reliance Standard Life Insurance Company* provides further guidance. There, the Third Circuit held that an orthopedic surgeon was disabled within the meaning of his long-term disability policy because the stress of his occupation was likely to exacerbate his condition and cause a heart attack. 334 F.3d 381, 383 (3d Cir. 2003). Again, the court found that a present condition was disabling not because it physically prevented the insured from completing their work, but because a return to work was likely to exacerbate the condition into a serious injury. The district court in that case noted that "[i]t is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health . . . . Where medical prudence requires a cessation of work activity, the insured is disabled." *Lasser v. Reliance Standard Life Ins. Co.*, 146 F. Supp. 2d 619, 628 (D.N.J. 2001), *aff'd*, 344 F.3d 381 (3d Cir. 2003). *Osborn* explicitly distinguished itself from *Lasser*, noting that, there:

> [T]he material duties of the plaintiff's job caused a sufficiently high risk of future harm so as to render him disabled. The plaintiff received recommendations from multiple medical professionals not to return to his practice. Additionally, the work itself threatened the plaintiff's health, there was nothing he could do to meet the occupational requirements of his position without risk, and, hence, he was deemed disabled.

No. 1:21-cv-00842-CDB, 2024 WL 1020486 at *10. The circumstances in *Lasser*, as explained in *Osborn*, are akin to those applicable to Plaintiff. Not only do the material duties of her work put her at severe risk of COVID-19 due to her underlying medical impediments, but she was counseled against returning to work by her physician. While Unum insists that Plaintiff could have taken reasonable steps to lower her risks of COVID-19, the only basis for that conclusion it

provided was that she could have used "preventative measures and PPE as outlined by OSHA." In 2020, when vaccines were unavailable, it is unclear what preventative measures Unum specifically intended Plaintiff take. Defendant also failed to specify what PPE would have reasonably mitigated Plaintiff's risk of COVID-19 and resulting injury or death. Additionally, PPE did not significantly mitigate the high risk of COVID-19 exposure, and that, coupled with Plaintiff's underlying medical issues, rendered Unum's suggestions deficient.[4] Plaintiff argues, as an additional basis for her claim, that she was disabled during the claim period independent of her risk of COVID-19. Since her underlying medical issues, the specific nature of her work readily exposing her to COVID-infected patients, and the particular risks associated with COVID-19 in 2020 render her disabled, that issue need not be reached.

## V. CONCLUSION

For the reasons above, judgment is granted for Plaintiff.

**IT IS SO ORDERED**.

Dated: August 19, 2024

RICHARD SEEBORG
Chief United States District Judge

---

[4] A 2020 study found that while healthcare workers with inadequate PPE had the highest risk of COVID-19 exposure, "increased susceptibility to infection was evident even among those reporting adequate PPE." Long H. Nguyen et al, *Risk of COVID-19 among front-line health-care workers and the general community: A prospective cohort study*, 5 Lancet Public Health e475, e481 (Jul. 31, 2020).